Court is now in session. The next case today is the United States v. Wayne Hunt, appeal number 20-1009. Attorney Gold, please introduce yourself for the record and proceed with your argument. Thank you. Good morning. My name is Ian Gold. May it please the court, I represent the appellant, Wayne Hunt. If I might, before I begin, request to reserve two minutes of potential rebuttal time? Yes. Your honors, the question before the court is whether Wayne Hunt has proved by a preponderance of the evidence that he is no longer sexually dangerous to others. As we lay out in our briefs, we think the evidence supporting that contention is overwhelming. There are three elements to such a finding. The first is not contested, it's whether someone has engaged in certain types of criminal conduct. The second two are the mental abnormality prong that I will be calling it in this argument, and the other is the serious difficulty prong. With respect to both of the prongs, the evidence in favor of Mr. Hunt no longer being sexually dangerous to others, which is the operative statutory phrase, was overwhelming, essentially uncontested. This constitutes a review of the district court's decision that, in fact, he had not quite made the end zone with respect to that determination. That was erroneous. As we argue in the briefs, it was contrary to the clear language of the statute. I think a close examination of the statements that the court made, that the parties made, the probation made, and the government made about the case have the tincture, the look and feel of a criminal proceeding. In fact, I think one story about this case that explains the district court's error is that despite being adverted to the fact that it was in danger of making a category mistake in treating this case as an early termination of a lifetime supervised release, a criminal supervised release term, when, in fact, it was a civil commitment case, that, in fact, is what happened. What I'm adverting to there is the district court's falling back on language about Mr. Hunt earning his way off supervised release or asking the district court to remove conditions, when, in fact, the statutory question is whether someone who was found to be mentally disordered and dangerous at a certain point of time retains that quality many years later. The context is it's a civil commitment statute, as the court is aware. It's 2021. These civil commitments were passed in the early 1990s and reached the Supreme Court in 1997 in Kansas versus Hendricks. What is clear from the decisions of Hendricks itself and the decisions that follow it is that these statutes pass constitutional muster because they claim to be and are real civil commitment statutes based on a present tense mental condition existing in the present, a dangerousness which exists in the present, and a condition that the statutory framework and the constitutional precedents tell us is something that should change over time. Mr. Gold, am I correct? Your fundamental challenge here may be the standard of review. We need to find that it was a clearly erroneous finding by the court that your client had not carried his burden of showing that he no longer had a serious difficulty in refraining from the conduct. It's certainly important. Four minutes. I would agree with that. We have a dispute about what the standard of review is. I reviewed the precedent in the Fourth Circuit and also this circuit and believe a standard of some deference is the best articulation of what the standard of finding is. It's a mixed finding, though, and it's a factual finding, but the legal choice to say that this person remains in the category of a sexually dangerous person is one that I think is reviewed as a legal determination. Let me follow that up with a practical question. The district court is bound to any particular deference to its opinions here. This ruling was roughly two years ago, if I calculate correctly. Your client presumably has two years of additional evidence now that was not before the court. The court, I know, in its order referred to tapering and eliminated one of the major conditions, but left a few in place. Have you considered filing a Rule 60 motion based on this new evidence to see if the court would, in light of that new evidence, now finish the tapering? Your Honor is referring to the new evidence of simply more behavioral stability or whatever it would be? He had two years on the tapered without any requirement that he go to a counseling. He said two years of record, and presumably, if that's a clear record, that's substantial additional evidence. Well, Your Honor, I will say that I have considered it. If the court were to inspect the docket, it's not part of the record here. There is activity happening there. I do want to respond to the court's reference to Rule 60B, which I actually hadn't considered because the statute itself, and this is part of the argument, going back to the medicalized nature of the project here and why we think it's important that this decision be reviewed and corrected by this court, but that the statute itself provides for six-month re-reviews. It explicitly provides and contemplates that someone committed, pursuant to one of these statutes, without reference to any rule of civil procedure to review a past judgment or anything like that, will be able to make a new case based on change circumstances at that interval. That's how we view the statute, that we'd be able to basically, yes, come back in at a time when we're prepared to do so and ask the judge to re-review it. In support of the statute, you don't even need 60B or a 12-1 indicative ruling that we could then send back for a ruling. You could initiate a new motion. That's right. That's right. The statute, the regime invites that. But in this case, we are looking for guidance from this court. We are also preparing a case at the district time. But you don't want guidance isn't the ultimate aim here. The ultimate aim here is having the final conditions removed. Well, Your Honor, I've been thinking about this a lot. I don't know if it's merely semantic. I really don't know. But I resist referring to his case or this case as getting the conditions removed. I view it as a determination that he's no longer sexually dangerous, so that he can be released from the civil commitment and released from the label of sexually dangerous person. So it seems like a legal termination. The problem is that because, as you acknowledge, it's a mixed question, the piece of our review, which gives deference to the factual findings, just makes it complicated from your client's perspective. Could I ask Your Honor to elaborate? In other words, you're asking us to, in part, overturn the factual findings of the district court, which is subject to a clearly erroneous standard. Your Honor, I characterize it differently, and it may be that I'm not threading the needle precisely. I view this as a challenge to the district court's legal determination that this corpus of evidence, which was essentially uncontested, supports the conclusion that the district court made that Mr. Hunt remains sexually erroneous. And because it's uncontested doesn't mean that the court has to believe it. You find it de minimis, but there were the two incidents of watching that weird movie and searching on Amazon for the sex toys in Lubricant. He had an innocent explanation for the latter, but that doesn't mean the court had to believe it and couldn't consider it. That was before the court. I would point out that the court did not make reference to it. There was no challenge to Mr. Hunt's explanation of why he searched for Lubricant on Amazon, and I would point out that in a seven-year, and the corpus of evidence here is quite, you know, in a seven-year period, those are the two data points that the government has. Judge Ciarocan... No, the court also had the lifetime behavior of abusing children. Certainly he did. But in contrast to that, he had a 35-year period in prison, a two-and-a-half-year period of confinement when he was subjected to or provided state-of-the-art treatment and discharged pursuant to this cutting-edge treatment program designed by the Federal Bureau of Prisons. He was determined to be successful. He was stepped down to maintenance conditions and then successfully complied with those conditions, except for the two data points that the court brought up and the government relies on without a hiccup. Why can't we view this case as a situation where you have a district court judge who's been very moderated, who has adopted this, you know, tapered approach is very familiar with this individual. And in the end, if you look at United States v. Carta, and going back to what my colleagues were referencing in terms of standard review, in Carta, this court held that our task is not to re-weigh the determination or to make credibility assessments. Why isn't that dispositive? Well, the district court, in my view, wasn't explicit about saying that he rejected any of the testimony that he heard in the sense that we had expert testimony. And again, the expert testimony in this area is based on science. It's based on research, not just an evaluation of the individual, but research, copious amounts of research about recidivism statistics that inform the opinion. And we also heard from Mr. Hunt, and the district court was very careful to be, I think, appreciative of Mr. Hunt's candor. But then use those items to make certain factual conclusions. First of all, I think if I had to summarize, the district court says that it parted ways with the expert because the expert did not value the mere fact of being on probation to the same extent that the district court did as contributing to what it was acknowledged was an ability to contain himself, an ability to control his behavior. And so that's what this court is reviewing. I think it's all out there. I think the district court was quite thoughtful, and its reasoning is laid out there in the decision. But we still argue that the district court was wrong, that there needs to be in the face of this sort of countervailing evidence. Again, if you are using the right terms, if we are saying sexually dangerous to others, if we are saying serious mental abnormality, if we are saying serious difficulty refraining from future sexual misconduct, those are the statutory terms that we had to answer. Again, not whether it would be of benefit to Mr. Hunt or in the interest of prudence that we maintain some level of supervision over this individual, but rather whether he continues to qualify under the statute based on this level of evidence. And I will point out that the district court's reasoning of where the district court landed, I think, was the court was unsure of to what degree merely being surveilled, being on supervised release, contributed to what was a manifest ability to control his impulses. And that sort of person is not committable. I mean, that's essentially what, you know, if we look at the statutory language and interpret that in context, if we look at the constitutional framework that in which that statute resides, we think this is not a committable person. Those sorts of speculations is not the sort of person that should be committed. And why couldn't the court consider that when it was assessing whether your client would have serious difficulty in refraining from sexually violent conduct? I mean, why couldn't the court factor in the amount of supervision he's under? Well, so I. Obviously, the court did. I think that. But you're saying the court was erroneous in doing so, and I don't understand that. Well, I do. I think if we go to the substance of the statute, it says serious difficulty refraining from sexually violent conduct. So there is a value to supervising someone with Mr. Hunt's background. Unfortunately, or unfortunately, he's paid his debt to society. He's completed all his criminal sentences. There's no more criminal sentence available to him like criminal supervised release to be employed here. But this is a civil commitment statute that is targeting individuals who have these two characteristics, serious mental abnormality and serious difficulty refraining from sexually violent conduct or child molestation. So I would say it certainly sounds logical, but the type of person who is experiencing that serious level of discontrol is not going to be so contained for that many years. The interesting thing about the district court's reasoning there is that it can be employed, you know, the reductio ad absurdum. It can just keep him on supervised release forever because you really can't tell when, to what degree, being on supervised release where there's no violations would be contributing to this ability to contain himself. And what I think it distracted from in this case is the treatment that the system asked Mr. Hunt to undergo, that he did participate in, that he did participate successfully in, in which, by all accounts, the discharge report which was incorporated into Dr. Plod's opinion describing that program, his own testimony, he had internalized as he had been asked to do and carries with him. And so this was a person that, so I'm not saying I completely off the wall sort of idea, but in this case, it was used to kind of defang a large body of evidence that both scientific and based on the individual case that this individual at that moment was not committable, that he had the ability to control himself. Thank you, Mr. Gold. Thank you. Thank you, Attorney Gold. Please mute your audio and video. Attorney Serafin, please unmute your audio and video. Introduce yourself for the record and proceed with your argument. Good morning and may it please the court, Jennifer Serafin on behalf of the United States. Your honors, no matter which standard of review is applied here, whether we look at the clear error standard for fact finding or the some deference standard that is applied to mixed findings, the record is clear that the district court engaged in a careful analysis of each of the three elements under the Adam Walsh Act and found that Mr. Hunt did not meet his burden. So, the Adam Walsh Act, which is at section 4248, has three elements. An element that looks to the past, to the present, and to the future. There was no dispute as to the first element, which looks to the past. No dispute that Mr. Hunt previously engaged in child molestation. There actually was also no dispute as to the second element, although it appears Mr. Hunt is trying to make an argument that there was on appeal, but actually during the hearing, there was no dispute as to the present element, that is, whether Mr. Hunt at the time of the hearing suffered from a serious mental illness, abnormality, or disorder. Mr. Hunt retained an expert, Dr. Plodd, and Dr. Plodd wrote a report, which is in the record at appendix 146, where he diagnoses Mr. Hunt with pedophilia, which according to the DSM-5 is a mental illness or disorder. At the hearing, Dr. Plodd also testified that Mr. Hunt has pedophilia, and that's in the appendix on pages 207 and pages 217. To be precise, every person under this statute with pedophilia would get that diagnosis for the rest of their life under the DSM, because there is no diagnostic criteria for remission. That's true, Your Honor, and Dr. If we rely on that, there will never be a person who doesn't satisfy that prong. Well, Dr. Plodd did raise this during the hearing. He said that he would issue the qualifier that Mr. Hunt's pedophilia was in remission, if he could, but that there was no provision for such a qualifier within the DSM. So this is the best case scenario for a as to the second prong, which is everyone who's incarcerated pursuant to that act will always have the diagnosis of pedophilia. But this guy, they say, actually, if there were a criteria for remission, he would qualify for it. That's how I understand the testimony. That's correct, Your Honor. That was the testimony. The important part... If that starts to raise the question, then if this person doesn't satisfy the criteria for getting released, and we haven't even got to the fact he's a 73-year-old in a wheelchair on gabapentin, then you're coming close to a situation where no one would ever qualify for complete discharge under the statute. Well, Your Honor, I respectfully disagree for one important reason, which is, although you're correct that anyone with a pedophilia diagnosis would presumably have that diagnosis for the rest of their life, because it's not something that goes away. And in fact, in the first trial, the initial commitment case, Dr. Plodd testified that pedophilia is akin to a sexual orientation. It's something that is just inherent within you, and it's with you for your whole life. But here, Judge Sorokin rejected Dr. Plodd's statement or testimony that Mr. Hunt's pedophilia was, in fact, in remission. And that's what distinguishes this case. The government is not suggesting that simply because Dr. Plodd diagnosed Mr. Hunt with pedophilia, that it means he automatically qualifies as a sexually dangerous person, that he meets the second element. In fact, Dr. Plodd himself- What's the factual basis for rejecting the testimony that he was in remission? Your Honor, it's primarily Mr. Hunt's own testimony that he has to manage this every single day. Mr. Hunt testified to the effect that it's a struggle. He's got to manage this condition every day, and he has to be aware of his triggers. For example, being in isolation, for example, being around young kids, particularly- Well, so does alcoholics. This sounds like a catch-22. You've got a diagnosis that is lifelong, so you've always got it. So what you're hoping for is that people realize that and they manage it every day. But if they tell the judge they manage it every day, then that's cited as reasons for keeping them incarcerated. It really is a catch-22. Five minutes. I respectfully disagree because, Your Honor, it wasn't just Mr. Hunt's testimony that he was in remission. It was Mr. Hunt's diagnosis, the fact that he has to work to manage it every day, coupled with his extensive 30-plus-year history of sexual molestation and sexually assaulting children, where he sexually abused scores and scores of boys as young as six. So the judge considered carefully all of these factors and decided to reject Dr. Plodd's that Mr. Hunt's pedophilia was in remission. Would Mr. Hunt's past offenses standing alone provide sufficient basis for continued supervision? You speak a lot, understandably, about his extensive history of past offenses. Would those past offenses standing alone provide sufficient basis for continued supervision? No, they wouldn't, Your Honor. And that leads me to the third element, which is really the crux of the case here. The third element is the future-looking element. That's the one that sort of tries to predict how Mr. Hunt will act in the future. Again, obviously, this is very difficult. Numerous cases across the country have focused in on this third element. The third element goes to volitional control, and that really is the most important element that courts consider. How can a petitioner show that their continued success is not wholly dependent upon the conditions of their release while remaining subject to those conditions? Well, Your Honor, the question is how can a person show that he has the volitional control, that he will be able to refrain from sexual misconduct if released, and if released under no conditions? One important way that folks who have been civilly committed under the Adam Walsh Act have tried to prove this is by their scores on actuarial instruments. There are tests, such as the Static 99-R, which are designed to weigh certain factors and come up with a score, and then that score looks at comparable offenders and comes up with actually percentages as to whether the person will recidivate. Dr. Plodd did not score that instrument here. He said that he didn't feel the need to do that. That is one way that Mr. Hunt, in particular, if Dr. Plodd had scored that test and Mr. Hunt got a low score, he could have used that to show, look, this actuarial instrument proves that I have volitional control. Another way that he could have done that was if Dr. Plodd had administered something called the PPG, which is a test that shows images of, in Mr. Hunt's case, it would have shown images of young children to him, and there's a device that can measure sort of the engorgement of his penis when he sees those images. Dr. Plodd testified that he did not administer the PPG in this case because he didn't see the need to. So, had Dr. Plodd administered those tests, Mr. Hunt might have had a basis to say, I do have volitional control, but he didn't. And I think in some respects, Dr. Plodd not administering those tests is something that could have factored into Judge Sorokin's decision to reject his testimony. An important case here is actually one cited by Mr. Hunt in his reply brief. It's the Shea case, which comes out of the Fourth Circuit. I noted here for the court because it was decided in March 2021. It's an Adam Walsh Act case under Section 4248. And it's a case in which Dr. Plodd testified. He was retained by Mr. Shea to give an expert opinion. And similar to this case here, in the Shea case, Dr. Plodd testified that Mr. Shea could be diagnosed with pedophilia by history, but that the current diagnosis was not such that he had intense sexual urges or fantasies. And the Fourth Circuit in the Shea case found that the district court properly rejected Dr. Plodd's testimony. So, you have a very similar fact pattern on this issue. You have even the same doctor, the same diagnosis, and it's the government's position that that case is instructive here. Counsel, that's time. As far as the government's position, I understood from the record that the Department of Justice took no position adverse to Mr. Hunt. The government did not advocate that he be retained on conditions. Your Honor, the government initially said that the petition to be released from all conditions was premature. And at that point, it seemed like Mr. Hunt was doing well by all accounts. And it seemed like the direction that things were heading was that the government perhaps would not oppose, which the government has taken that position in two other cases. And I'm not sure if that's correct, but that was a case where individuals were releasing to districts outside of Massachusetts. Then there was a change and the government told the court that they would need to go forward with a hearing, that the government was going to not be able to take no position. And so, during the hearing, there were only two witnesses. It was Dr. Plodd and Mr. Hunt. The government did not testify. The probation officer was there at the hearing and spoke to the court from counsel table, but did not testify. If there are no further questions, the government will rest on its brief. I just have one question based upon Judge Kayotta's question. Was the government's change of position a policy determination, or was it just a case-by-case re-examination? Your Honor, I don't believe that this is in the record, but what is in the record, and I think is in the government's brief, is that probation in Massachusetts is the one who would be supervising Mr. Hunt. And where the two other defendants released to, Mr. Shields released to probation in Maine, Mr. Carta released to probation in Connecticut. So, probation in Massachusetts appears to have different policies than probation in other states. Can I ask one question going to Judge Kayotta's question regarding ongoing review of Mr. Hunt? What is your understanding of whether there's some sort of ongoing review in process, or potentially in process, since two years ago? There is ongoing review, Your Honor. I would characterize this case at the district court level as somewhat active. It's certainly not dormant, but there has been activity even in the last few months. So, that is proceeding. Counsel, I'm not sure I understood your answer about what you were saying about the difference in probation in Massachusetts as opposed to Maine. Sorry, Your Honor. I should have been more straightforward. So, the government's change in position was based on Massachusetts Probation Office's policy. Which is? Which is their policy? Well, apparently, it's different from the policy in other states, which is that they will not agree to not oppose, right? They will not agree to take no position or not oppose someone being removed from all conditions, that we would need to go through a hearing similar to one that we did before Judge Sorokin, and have the judge decide the issue. So, I would say in this case, it was based in part on probation's policy. And then, you know, obviously, the findings that the judge made about Mr. Hunt's volitional control is really why we're here. So, someone has a better chance of getting released in Maine than in Massachusetts? Well, not released, Your Honor. I think what's important to remember is that Mr. Hunt is, has been released, right? He's in the community. He's had some better chance on something you're telling us in Maine than in Massachusetts because of different positions, not of probation. Released from conditions. Released from all conditions. I mean, it's an N of three, right? There's Mr. Shields in Maine, who released to Maine. Mr. Carta, who released to Connecticut. And then, this is the first case here where the person would be releasing to Massachusetts and being supervised by probation in Massachusetts. Thank you, Counselor. Thank you, Your Honor. Wait a minute. Judge Kayada? Yeah, I just thought, what do you mean released to probation? We're talking about release from probation if they're released from conditions. Sorry, that was bad phrasing, Your Honor. What I meant was that Mr. Carta, for example, in Connecticut, once he was released from BOP custody on conditions of supervised release, he was being supervised by probation in Connecticut. And then, after some period of supervision on those conditions, those conditions were eventually all removed. And for Mr. Shields, for example, in Maine, once he was released from BOP custody under the Adam Walsh Act on conditions of release, he was supervised by probation in Maine on those conditions. Here, Mr. Hunt, who lives in a single-room occupancy at a homeless veteran's shelter in downtown Boston, is being supervised on those release conditions by probation in Connecticut, supervising him for the seven years that he's been out in the community. And so, they won't let go of him unless a judge tells them to, whereas in Maine or Massachusetts or Connecticut, they will? That's my understanding, Your Honor, based on those two other cases. And how does the statute, how does that, an appropriate factor under the statute, it sounds like there's a policy, and rather than a fact-based, individual-based determination that is driving things here. Well, I'm not sure that it is a firm policy, Your Honor. I mean, I have not seen a written policy that says any of this. I'm just giving the court my understanding from those cases. And I was will hold on to these guys forever. I don't think in all candor that probation wants to. I think they would be happy to remove all conditions and spend their time and resources supervising someone who really needs the supervision. Here, I think we have the court's finding that Mr. Hunt still has issues with volitional control, and the court ordered that he be tapered down. And that makes some sense, right? He started with 32 conditions. Seven years later, he's only at 13 conditions. And I think the implication was that the court said, let's see how he's doing on these conditions. He wants to pursue treatment voluntarily. Let's see if he actually does that, and then we'll come back and revisit this. And I think the court was very open to doing that. Any other questions? Thank you, Counselor. Thank you, Your Honors. Thank you, Attorney Serafin. Please mute your audio and video. Attorney Gold, please unmute your audio and video and proceed with your two minutes of rebuttal. Thank you. May it please the court. I think it does make some sense what the district court did, but our position, as the court is aware, is that it was unlawful, that the court did something eminently sensible, reasonable-seeming, and simply not consistent with the law. What the government just described, I think, is also an arbitrary and unlawful situation. The government, the way I read the record, was quite clear that it pegged, as it was, this civil commitment due to a mental abnormality with the end of treatment for that abnormality. It was quite explicit about it, but then it did a switch in time that saved probation, I suppose, and went ahead with this case, and then we had the ruling from the district court. But what the government has articulated is no consistent policy. Respectfully, I believe that probation doesn't know or have much insight into the parameters of the legal category that we're talking about here, which is sexually dangerous person. They are a big hammer. They very effectively hit nails, and those are individuals on supervised release who are potentially dangerous. But this special category of very, carefully carved out of our other legal traditions is something that I don't think they have a lot of experience with, at least in this district. There's an N of three, as the government said, and shouldn't be consulted about what they feel with respect to the category. They can talk about factual matters, and that's how it should go. I do want to respond to the fact that the government is simply mistaken with regard to the testimony and the facts regarding the second prong of the statute, which is mental abnormality. The government cites the Shea case, which I also commend to the court, as well as other circuit cases elaborating this statutory and constitutional regime. Science has marched on since this particular individual was committed. There is now a DSM-5. There used to be a DSM-4. The DSM-5 is actually very careful. It's cited in the reply brief, and it's cited as a learned report, but not explicitly part of the record. It makes this distinction very explicit. It says there's pedophilia and pedophilic disorder. Pedophilia is like a sexual orientation. It is not expected to change. Pedophilic disorder is expected to change with time, with age, and with interchanges that might change that diagnosis. It's an entirely new regime that I believe the government is simply unfamiliar with. The argument is simply that the pedophilia doesn't change, but this disorder has decreased. In addition to Dr. Plodd's testimony, what we're talking about here is intensity of feeling and propensity to act. We believe there is a good case on both prongs, both the mental abnormality prong and the very adjacent serious difficulty controlling behavior prong. It's based on science and the law.